Good morning. May it please the court, Henry Harmeling for the appellant, Aaron Killgore. May I please reserve three minutes for rebuttal? Hold on. One moment, counsel, while we have counsel approaching the bench. The joys of arguing by video. Hi. May it please the court, your honors, Amy Todd here for appellees. Wait a minute. Okay, my apologies. Let's start this again, please. Appellees are at the table. Judge Sanchez. Counsel, you may begin. Thank you. May it please the court, Henry Harmeling for appellant, Aaron Killgore. May I please reserve three minutes for rebuttal? Counsel, you may. Thank you, your honors. In this whistleblower retaliation case, summary judgment was granted at the district court level. Apparently based on complaints regarding the timeline for the completion of the environmental analysis. And based upon the district court's conclusion that the complaints that Mr. Killgore made were solely internal complaints. The district court states he only provides evidence that he was concerned about the timeline. And that's at page 44 of volume one of the record. Initially, Mr. Killgore was employed by the appellee, not the U.S. Army. So Laura Cavallaro, Chief Cavallaro, was not Mr. Killgore's supervisor. She was external. So any complaints which are regarding the, specifically regarding the external, excuse me, any complaints to Ms. Cavallaro were external complaints. And it's noted in the record at pages 35 and 36 that Mr. Killgore refused to participate. And he complained repeatedly about the refusal to include any. So counsel, on the refusal to participate part. Yes. I couldn't find anything in the record which indicated a refusal to participate. I found plenty of instances where he was complaining about things, but I didn't see any record reference that I could find that he was refusing to participate. What would be your best record reference for me to look at that demonstrated a refusal on his part to participate? Thank you, Your Honor. Sure. Well, the draft EA, the draft agreement analysis, excuse me, written by Mr. Berger that contained reference to the past helicopter training in which precipitated a requirement that Mr. Killgore and Mr. Berger apologized to Chief Cavallaro. There are numerous references there. So to take a step back, one week prior to his termination, a draft analysis was submitted by Mr. Berger at Mr. Killgore's direction. Mr. Berger was Mr. Killgore's subordinate. This is the one that had the helicopter info in it. It had the helicopter info in it. So he was clearly participating in that. He was participating. But the flip side of that is that he refused, as he was, he refused, and this is from the Ferretti case, 855-F-7. I understand. I understand what refusal means. I want to know what the record reference is. So go ahead. Sure. Well, Ferretti talks about violated and would continue to violate pertinent regulations. And in this case, Mr. Killgore refused to violate the pertinent regulations, meaning that he was not comfortable moving forward with the EA without references to the prior helicopter training. Mr. Berger himself drew a straight line between the draft EA and Mr. Killgore's termination. He stated, and this is Volume 3 at page 437, it seems somehow obvious to me, intuitively obvious, that getting fired was on the table. You know, we had this just the week before, this thing about having to apologize to Laura Caballero. And so what happens here is that Mr. Killgore was not comfortable moving forward. And, in fact, there's testimony in this case that Mr. Killgore and Mr. Berger had discussions amongst themselves regarding their personal illegality. And in this case, Mr. – sorry, I'm trying to find the right spot on the record. It's a pretty thin read, Mr. Hermeling. I understand that there were several people that were uncomfortable with the decision not to include those aspects into the analysis. But I, too, am having a hard time seeing where there was a refusal to do something. Can I – go ahead. I apologize, Your Honor. Go ahead. I wanted to actually switch gears a little bit to ask you about the allegations made to his supervisor, Mr. Emerson, and to explain your thinking behind whether that qualifies as a protected activity under the whistleblower statute or not. Well, those were internal communications to Mr. Emerson, so it may be debatable as to whether the communications to Mr. Emerson were protected communications. And once again, the record at pages 35 and 36 is replete with references that, in fact, Mr. Killgore communicated outside of normal channels to Ms. Caballero, and those would clearly, without any doubt, be outside of normal channels. Let me go back a second to Mr. Emerson. Why wouldn't – and I guess this qualifies as a softball question – but why wouldn't under 1102.5b, why wouldn't reporting to a person with authority over the employee qualify? Because Mr. Emerson was the supervisor. You are correct, Your Honor. He did have the authority to investigate, discover, or correct the violent – well, I guess, yeah, he had the authority to investigate or discover, and then whether he had the authority to correct the violation or not, that's a separate issue. Counsel, why should we read who has the authority to investigate, discover, or correct the violation as modifying a person with authority over the employee? Doesn't the last antecedent rule, which is part of California statutory construction, suggest that that language only modifies another employee and that the person with authority over the employee is a stand-alone part of the statute? I would agree with that, Your Honor. I'm not surprised. Following up with that, if these were protected allegations made to a supervisor under the whistleblower statute, is that basis alone to reverse, or do we also have to reach issues about the disclosures to Chief Caballero? Well, I think we have to also get to the issue of the pretext, which is addressed very extensively in the appellee's brief. And the appellee contends that Chief Caballero's complaints during the June 22, 2017 meeting, that's the date that Mr. Kilgore was terminated, had nothing to do with the alleged concerns that plaintiff had about the Conroe EA. And, again, there's no way to read the record, the entirety of the record, and conclude that all this conflict and this submission of the draft EA with the helicopter information referenced had nothing to do with the draft EA. Well, counsel, I mean, we don't have to read the whole record. All we have to decide is whether looking at the evidence in the light most favorable to you and with inferences drawn in your favor, a reasonable prior fact could conclude that there was cause and effect, right? Exactly. And, once again, there's a one-week separation of time. And I read that quote previously from Mr. Berger, and Mr. Emerson stated that, you know, right in this time frame, he had indicated to Mr. Kilgore that if Chief Caballero called him again, that either Mr. Kilgore or Mr. Berger would be terminated. Okay, I want to go to a different issue, counsel. Putting aside the helicopter issue and whether that could be illegal because of, for example, cumulative effects, I'm having a difficult time seeing why doing this quickly as opposed to slowly would be illegal, that your client's saying, we can't do it in three months, we need 18 months or whatever. How is that illegal? How does it violate the law to do something quickly as opposed to, how does it violate the law not to include cumulative effects? Sure, I mean, the two issues are obviously very closely interrelated, and so the timing in and of itself, there's nothing that says an EA has to be completed in X amount of time. Here, there was no, and then the EA hypothetically might have been completed here in the prescribed time frame with the constraints, meaning a complete absence of an analysis of the cumulative effect. And so it's only when you take the two in conjunction and you take the three-month time frame and then you superimpose on top of that a refusal to look at the cumulative effect. The cumulative effect would have taken much longer than three months, and there are a lot of references in the record to what they would have had to look at, what they would have had to analyze on the ground, and in and of itself, it could not have been done. So I think the only way to answer that is that in and of itself, and as the district court seemed to kind of do and kind of put it out on an island, the district court may not have been wrong that in and of itself and out on an island, the time frame itself was not illegal, but the failure to take into effect the cumulative effect past, present, and future, that's where the timeline becomes illegal, and it becomes a complaint that the hard look required by the NEPA cannot be satisfied within that three-month time frame. Can I ask you a different question? One of the determinations the district court made was that the disclosures to Chief Caballero were not actionable because they were part of his normal duties. That doesn't seem to accord at all with the language of the statute, which protects whistleblowers, and at the very end it says, regardless of whether disclosing the information is part of the employee's job duties. Did that issue come up before the district court, the inconsistency between the determination and what the statutory language actually says under 1102.5b? I don't believe that issue did come up because the district court's determination came up only after the oral argument, and I see that I'm running out of time here. Okay. Thank you. If you would, please, yes. Who would like to begin? Okay. May it please the Court, Amy Todd Geer on behalf of Apelli SpecPro. I did want to begin, Your Honors, with first addressing one of the points that opposing counsel raised. There's no evidence in the record that Appellant ever directed Oscar Berger to send anything at all. If you look at record at 138 and at 139, Aaron Kilgore said that Oscar sent it and that Ms. Caballero was upset with Oscar Berger, not with him. But Ms. Caballero, I recall reading somewhere that she suspected that he had been directed by Mr. Kilgore to send that draft, and since we're reviewing on summary judgment, I don't see why it would make a difference whether there's evidence in one way or the other. In other words, isn't that just a tribal issue if we were to remand? So let me get to the reasons, then, Your Honor, why it should not be remanded. First, in terms of disclosures under the whistleblowing statute and the NEPA process itself, this is very specific to the National Environmental Protection Act and the EA process. The NEPA process is to determine and focus on proposed actions, forward-looking. We provided to the district court the request for judicial notice, which lays out the counsel and environmental qualities, assessment of what needs to be included with respect to past actions, and that very clearly provides government agencies, here the United States Army, with the ability to determine what, if anything, needs to be provided in an EA with respect to past actions. The focus is on proposed actions going forward. Here it changed because the helicopters had been hovering well above the land. Now they were going to be landing on the land, pursuant to a lease with the Texas Department of Corrections. And under those circumstances, that is why the environmental assessment was required. And that goes to your view of the reasonableness of plaintiff's belief? Yes, Your Honor, it does. Because he's certain for a couple of reasons he could not have believed, Your Honor, that this was any violation of NEPA, not only because the count USARC had substantial discretion to make that determination, but also, Your Honor, because he admitted that, under Mr. Kilgore's own view, that there can be no violation of NEPA until the document is signed, until it is final. But it's a potential. He was arguing, if you don't put this in, you're violating the law. There's no doubt that that's what he told Chief Caballero and Mr. Emerson, right, in looking at the evidence and the like most favorable to him. He did advise them both about the timeline and about the prior helicopter. He advised them that, in his view, not including the past helicopter stuff was illegal, right? He did not say that to Ms. Caballero, Your Honor. That is not in the record. And as the district court found, he did not make any statements to that regard with respect to Ms. Caballero. Well, he certainly said it to Mr. Emerson, right? He did say to Mr. Emerson that he believed that if it was not included, it could violate the law. Yes, but his language was that it would or it could possibly. He also testified directly that there can be no violation until the document is signed. It's similar to— So someone can't be a whistleblower, in your view, if they're complaining about something that is going to violate the law in 30 seconds when you sign it. Don't sign that, Supervisor. Let's not have anybody sign that or Army, Air Force. Don't sign that because if you do, it's a violation that that person is not a whistleblower if they're fired because of that, because they didn't wait until after it was signed to say, you just violated the law. You shouldn't have done that. Your Honor, this needs to be placed in the context of what the environmental assessment process is, which is all of these individuals, Melissa Russ, Oscar Berger, Aaron Kilgore, they're all part of a process of discussing what needed to be included in the environmental assessment and what did not. That is a part of what they do for a living. Taking their argument to its logical conclusion, which is that any statements about what needs to be included or what not may violate the law, that is exactly what they were talking about in an EA. That means anyone, truly to its logical conclusion, any of these folks saying anything about whether a land use survey needs to be done, whether floral and fauna needs to be done, whether they need to do an environmental contamination report, any of these items that they are discussing as a part of doing an EA under NEPA, could potentially be a whistleblowing action that cannot be with the statute of terms. It could potentially be a whistleblowing action if the person is saying, failing to include this violates the law, and if the person has reasonable cause to believe that it is a violation of the law. I mean, someone saying you need to put irrelevant stuff in there, or you violate the law, is not going to meet the reasonable cause test. But as I understand your argument, looking at the evidence in the light most favorable to the plaintiff, no reasonable trier of fact could find that his illegality belief was reasonable. Not when he himself has said there could be no violation until the document is signed. The process was not completed, and the document wasn't signed for three or four months after he was separated from the company. But counsel, why does it matter what he believes if the statute itself says that they may not retaliate if the employer believes that the employee disclosed or may disclose information to someone? So that suggests to me that it's not only the completed act of signing an assessment, but also the prospective act of signing an assessment if the belief is there, the reasonable belief that that may violate the law. So in other words, I don't know that it matters what Mr. Kilgore believes one way or the other if the statute contemplates that someone may whistleblow in the future and they are retaliated against for that. Okay. But his claim was not that he would be retaliated against in the future. I'm not sure I understand your question. Only in that the statutory language, the California law contemplates that if someone is retaliated against not only for a completed act, you know, let's say they signed the EA and then he's retaliated against, but for a prospective act, you know, where the employer believes this whistleblower may disclose information in the future. That suggests to me that it doesn't matter whether the EA was signed or not or the assessment was signed or not in order to have a viable claim under the California law. Well, the language is that whether the employee has reasonable cause. An argument is that he cannot have reasonable cause if his own understanding of the law, which was correct and should have included the fact, which is undisputed, that the government agency had the right to determine, and USARC did, that the prior actions of hovering above the land did not need to be included or were not relevant to a document that is designed, the EA, to look at the proposed action going forward. So how does that square with our prior precedent about Klamath Wildlands, which talks about the necessity of the agency describing the cumulative impacts and including those specific details, not even generalized statements. So the agency doesn't have complete discretion to blow off prior activities if they bear on future conduct, does it? No, Your Honor, but according to the Council on Environmental Quality, that is at 781 to 784, they do have the right to determine and have substantial discretion to determine what should be included and what should not. And I do see that I'm running short on time, so I also wanted to make sure to mention that in the opening brief here from appellant, there was no mention or discussion of our legitimate business reasons for terminating Mr. Kilgore, which are many, which my colleague may address in some as well. And there was no evidence, contrary to what the opposing counsel was arguing, there is not evidence of pretext. We had a litany of reasons that Ms. Caballero, the client for RespectPro, raised with respect to Mr. Kilgore's disrespect, his going in front of the Navy. I'm not sure how that has any bearing because all we're left to determine here is whether what he disclosed to Mr. Emerson or Chief Caballero were protected under the law. If those are protected statements, then you get into an analysis of whether the firing was pretextual or not or valid business reasons, but I don't see how that has a bearing on this appeal at this moment. Because it was not, because we, they did not address that. I mean, the standards would go. Did the district court make a determination on that these were legitimate business reasons? No, it did not, Your Honor. So what could they have done? Appeal the potential finding later that the district court might find that the reasons for firing were legitimate? There was no evidence even at the district court level from opposing counsel with respect to those findings, Your Honor, and so that is why we raised it at this juncture. With respect to, again, seconds left, NEPA is a forward-looking statute and the government has the discretion to make that determination. They did so in this case, and for those reasons, we believe that any reason he had to believe would not be reasonable under these circumstances, Your Honor. Thank you. And I will leave the rest of my time for my colleague.  May it please the Court. Thank you, Your Honor. My name is Denise Tran Nguyen on behalf of the appellees, Spec Pro Professional Services. I would like to just briefly start by following up on my colleague's point. The panel has asked about whether the statute contemplates potential violations, and it actually does not. If you look at the language of 1102.5b, it says that if the employee has reasonable cause to believe that the information discloses a violation, it doesn't state that the employee must only disclose a potential violation. Well, actually, it says if the employer believes that the employee disclosed or may disclose information to a government law enforcement agency, to a person with authority of the employee, or another employee who has authority to investigate, discover, or correct. So that or may disclose contemplates something other than a completed disclosure. Does it not? No, Your Honor. I respectfully disagree. The may part modifies the word disclose. So what that statute actually means is that a whistleblower may be entitled to protection either if they do actually disclose or if the employer reasonably believes that the employee may disclose an actual violation, not may disclose. I suppose maybe this is more of an academic discussion because we know he did disclose. He disclosed to Mr. Emerson his belief that there may be a violation of law if you don't include the cumulative impacts. And he disclosed other things to Chief Caballero. I don't know that it was as clear as stating that it was a violation of law, but there were disclosures made to a couple of individuals. So does it make a difference at the end of the day? It does, Your Honor, because even if he disclosed, he needs to have a reasonable basis that what he is disclosing is an actual violation of the law. And so you're going to what your colleague said, that they're really in this circumstance for this information. There can't be any whistleblowing until the document is actually signed, no matter what. That's correct, Your Honor, especially given in light of these facts because Mr. Kilgore specifically says he indicates his belief that there can't be a violation until the document is signed. So his mindset at the time he made the disclosure is at the beginning or the inception of the EA process when it was just beginning underway. So at the time he made the disclosures of the things that he thought needed to be included, he didn't have a reasonable belief that the substance of the EA, which is not complete, could have been a violation of NEPA. Counsel, it's not clear to me that this statute is ambiguous on this point, but let's arguendo take that the statute is ambiguous. How does your reading of the statute advance public policy, i.e., how does the idea that a whistleblower saying in this circumstance in two minutes, you're going to violate the law, you're fired. You're going to violate the law when you sign it, you're fired. That's not actionable when he's trying to prevent a violation. How does your reading of this statute, if it is ambiguous, serve public policy goals that California had in mind in adopting it? Well, Your Honor, in your example, if the EA was going to be signed 20 seconds later, I think the violation is more imminent that it's going to happen, whereas in this case it would be speculative because there was three months until the EA was actually signed. So until then, there's all these processes that both SPEC-PRO and the 63rd could undertake to do their due diligence. So in that case, if we were to allow— Or they could fire the reporter. I mean, I suppose. And that way there's no whistleblowing under your reading and the nail that's sticking up is pounded down. I understand that's not a question. Go ahead, counsel. Let me ask this. Assume for a moment that the helicopter activity from the past actually involved landings and there was no authority for it, there were no reports or environmental reviews. Would the agency in this case have the discretion to disregard the cumulative impacts of prior landings in determining whether to put that in the environmental assessment? Well, again, the Council on Environmental Quality that promulgates and enforces the NEPA says that agencies have substantial discretion as to whether— So in that hypothetical, would those prior landings be within the discretion for the agency to disregard even in that circumstance? Well, the agencies that also in the memo that the CEQ provided, the agencies can indeed conduct an adequate cumulative effects analysis by focusing on the current aggregate effects without delving into the— My question is, under this hypothetical, if the prior helicopter activity involved actual landings, not just hovering, is it your position that the agency could still determine not to include the cumulative impacts of those prior landings in assessing this forward project? I think, again, NEPA is very fact-specific. So, I mean, if it entailed the same exact landing in the same exact airspace, then potentially if they were similar, then it should be addressed in the EA. But this is not the case here. Well, but I recall that Mr. Kilgore said in one of his depositions that he spoke to a pilot which indicated to him that there were actual landings that took place. So isn't that a disputed question of fact as to what happened in the past that should be resolved at a trial? If I recall from his testimony, his testimony was speculative as is recollection. He mentioned that, you know, I spoke to an air pilot. There may have been. I'm not really sure. And so he didn't even come forward with affirmative-like statement that there was, in fact, landing. He was just making speculations, trying to recall his conversations with the pilot. And those comments weren't substantiated in any way by his colleagues. Melissa Russ, who was the employee of Aegis, which was the consultant that SPECBRO had hired to assist with the EA process. Okay. Any last final comments before we turn it back? No. Thank you. Okay. Thank you. Okay, Mr. Hamelin, you have the last word. Appreciate that. Thank you, Your Honor. Very briefly, the CEQ has been referenced multiple times. At page 782, the CEQ indicates agencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effect of all past actions combined. There was some discussion with respect to the reasonableness of Mr. Kogor's belief and whether he believed that there was actually a statutory violation. There's testimony from Mr. Berger at page 410 of the record where he states, Aaron said, but yeah, you guys, we are being asked to do something that's not consistent with NEPA. So there is testimony on the record from the subordinate, Mr. Berger, that the testimony is inconsistent or that the actions are inconsistent with NEPA. And as far as the public policy concerns go, there's no doubt that there was a chilling effect here, and both Mr. Berger and both Ms. Rust testified to it. Mr. Berger was asked, and this is at page 452 of the record, and notwithstanding the fact that you held this belief that the disclosure should be put in the DOPA and the EA, you were not terminated as a result of raising the concern that the sufficiently vague language should be included. Is that correct? Mr. Berger says, that's correct, but I mean, after Aaron was terminated, you might say that I was scared and I didn't, I was going to be really cautious expressing any issues I had on something like that, especially around, I mean, that you can imagine, like, if your will and you're managing the situation, this is a very valuable contract and you've almost lost it because of this action. So, you know, I wanted to be, I just wanted to get it done, and that's where I put my energy. And Ms. Rust is posed with a very similar question. She says, and then, or she was asked, and then did Oscar say that given that Kilgore got fired and Oscar got reprimanded, Oscar was going to be very careful about, you know, avoiding pushback to Ms. Caviero on the prior helicopter use? And Ms. Rust says, right, yes. And Ms. Rust, and that's at page 703 of the record. At page 704, Ms. Rust concluded, at the point where Aaron was fired, we decided this was their document, so we'll write it the way they want it. All right, I'm out of time. Thank you. Thank you, Counselor, and thank you all for your arguments. The matter will stand submitted and we will be in recess until 1.30. All rise.
judges: BENNETT, SANCHEZ, Foote